**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MARLENE GIOIA,**

                **Plaintiff,**

      v.                                                             3: 07-CV-102

**DELAWARE AND HUDSON**
**RAILWAY COMPANY, INC. d/b/a**
**CANADIAN PACIFIC RAILWAY**

                **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

## DECISION & ORDER

**I.    INTRODUCTION**

Plaintiff Marlene Gioia commenced this action alleging claims of disparate treatment and hostile work environment employment discrimination based upon her gender and age. See Second Am. Compl. dkt. # 6.[1] Defendant-employer, Delaware & Hudson Railway Company, Inc., doing business as Canadian Pacific Railway, moves pursuant to Fed. R. Civ. P. 56 for summary judgment seeking to dismiss Plaintiff's claims in their entirety. For the reasons that follow, Defendant's motion is granted in part and denied in part.

---

[1]The Second Amended Complaint alleges that Plaintiff was discriminated against on the basis of her gender and age, but cites only Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII") as a basis for her claims. Defendant has addressed the age claims under the under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"), and the Court does the same.

1

## II.   STANDARD OF REVIEW

The Court will apply the well-settled standard for deciding summary judgment motions in discrimination actions. See Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000); Bracci v. N.Y.S. Dept. of Correctional Services, 2005 WL 2437029, at * 1 (N.D.N.Y. Sept. 30, 2005) (McAvoy, S.J.).

## III.   FACTS[2]

Plaintiff Marlene Gioia, who is 57 years old, worked for Defendant from 1980 until her termination in May of 2006. During this time, she held the positions of Clerk, Yardmaster, and Terminal Yard Coordinator ("TYC"). She was promoted into her most recent position, the TYC position, in 1997. The position was offered to her by August J. Troccia, Defendant's manager of operations for its northeast division. Troccia and Bill Farley[3] served as Plaintiff's supervisors in the TYC position. Plaintiff was 46 years old when she was promoted into the TYC position.

A TYC is a management-level position responsible for the safe and efficient movement of trains on the railway. The duties of the position include directing and

---

[2] The background facts are taken from the parties' L.R. 7.1(a)(3) Statements of Material Facts. On this motion, the Court accepts as true those facts that are admitted by the opposing party, or that are supported by admissible evidence and not properly denied. See L.R. 7.1(a)(3)("Each denial shall set forth a specific citation to the record where the factual issue arises."). The Court views all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 127 S. Ct. 1769, 1776 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id. at 1776.

[3] Farley worked as a Senior TYC in the Binghamton yard from 2002 until Plaintiff's termination, and he reported directly to Troccia.

2

coordinating daily switching and train operations in the yard, supervising yard crews, making operational decisions, conducting safety meetings and ensuring compliance with company safety policies, and resolving minor complaints and grievances.  At all times relevant to the claims in this action, Plaintiff was the only female holding the TYC position at Defendant's Binghamton, New York terminal.

A TYC receives a yearly performance review known as a PMP.  A PMP involves evaluations of varying subjects.  Some subjects, such as productivity and efficiency, are objectively measured, whereas others, such as leadership and adherence to corporate values, are subjectively determined.  An employee is given an overall rating on a PMP assessing whether the employee achieved his or her goals and responsibilities for the preceding year.  When an employee receives a "partially achieves" rating on a PMP, the company identifies the performance deficiencies that contributed to the rating and requires that employees assist in putting together an action plan to improve performance. Plaintiff received a "partially achieves" rating on her 2003 PMP (related to her performance during 2002) and her 2006 PMP (related to her performance during 2005).

On her 2003 PMP, Plaintiff received a "partially achieved" rating because, Defendant contends, she exhibited poor work performance, insubordinate behavior with her supervisors, and a confrontational attitude with her subordinates.  Plaintiff asserts, however, that the 2003 "partially achieves" rating was based upon subjective criteria evaluated by Troccia that did not fairly reflect her job performance.  She contends that Troccia evaluated her more harshly than other TYCs because of her gender and her age, and made statements indicative of gender and age animus.  In this regard, Troccia told Plaintiff during her 2003 evaluation that "[she] wear[s] her heart on [her] sleeve, and he

3

didn't like any of [her] body motions, [her] lips, [her] eyes, didn't like any of it." Gioia Dep., p. 127.[4]  Troccia also stated that "maybe [she] was just too old to change."

In January 2003, Plaintiff was placed on a six-month period of probation as a result of her having only partially achieved her objectives for 2002.  Plaintiff's managers then began meeting with her on a regular basis to monitor her improvement.  Defendant contends that Plaintiff nevertheless continued to exhibit insubordination with her supervisors and a confrontational attitude with her subordinates.  Plaintiff asserts, however, that Troccia began to falsely accuse her of problems over which she had no control, yelled at her on almost a daily basis, and constantly threatened to "write her up." She also asserts that Troccia mandated certain work rules that applied only to her and that were not related to her job performance or duties. She alleges that she could not laugh in the work place; she had to limit the movement of her eyelids so to prevent the appearance that she was "batting" her eyelashes; she had to limit her lip movements so as avoid the appearance that she was "pouting;" she could not shake hands with Troccia or walk down the hall with him; she was instructed to address Troccia as "Mr. Troccia" despite that other employees addressed him by his nickname, A.J.;  she had to limit her body movements to prevent the appearance of moving "too femininely;"[5] she was not allowed in her work building other than during her shift-hours,[6] and, at the end of her shift, was required to report to another building, lock herself in an office, and complete her paperwork in this

---

[4]Plaintiff admits that Troccia never made any overt gender-based comments to her.

[5]Plaintiff contends that on "a couple" of occasions, Troccia came into the room "and wiggled his hips and moved around and [made] fun of Plaintiff." As a result, Plaintiff changed her business attire to wear only large, baggy clothes.

[6]Plaintiff contends that all other TYCs were allowed "24/7" access to Defendant's work buildings.

4

location; she was seldom scheduled to work the more favorable day shift; and she was instructed to speak to Troccia only once a day during a morning conference call, and otherwise communicate with him only in writing.

The record contains numerous examples of written statements (emails) from Plaintiff to Troccia in 2004 and 2005 that, Defendant contends, were evidence of continued insubordination by Plaintiff, but which Plaintiff contends were merely attempts to defend herself from false accusations. Examples include a July 21, 2005 email from Plaintiff responding to a work-related comment from Troccia in which Plaintiff wrote, in part: "What's wrong [with] you? One would have to be deaf, dumb, and blind to think [the report] was accurate;" and an October 10, 2005 email in which Plaintiff wrote to Troccia: "What's wrong with you? Where is your common sense?" Plaintiff argues that due to the lack of respect afforded to her by her superiors, the individuals that she supervised failed to listen or respond to her directions. She claims that this cumulated in an altercation in February 2005 where one of her co-workers physically confronted her at work, grabbed her wrists, and bent her arm back. Defendant's investigation failed to assess blame and resulted in the Plaintiff being mandated to seek counseling.

It is Defendant's position that throughout 2005, Plaintiff had continued problems with train delays on her shift; responded to direction from her superiors with sarcasm, excuses, attempts to deflect blame on others, and insubordinate communications; and was unable to get along with her co-workers and the employees she supervised.

On January 12, 2006, Troccia and Plaintiff met to discuss her 2005 performance rating. Plaintiff received a "partially achieves" rating for the period based primarily on Troccia's assessment that she performed poorly in the areas of respect and teamwork.

5

After their discussion, Plaintiff wrote to Troccia:

> In reference to our discussion this A.M., your comment on how WE will get ME thru this is exactly what the problem is. The Communication is not just one way. I don't wish to "GET THRU THIS". I wish to get US thru this. If, in fact, you feel you are incabable (*sic*) of changing, then we might as well hang it up right now. We both need to look at ourselves. To exhonorate (*sic*) yourself from fault is a big part of the issue. Why I don't know. That is going to be for you to figure out. Actually, I do know why. But you need to realize it for yourself.

As a result of this communication, Troccia arranged a meeting on January 13 with Plaintiff and Labor Relations and Human Resources Manager Howard Buchanan. During the meeting, Troccia and Buchanan placed Plaintiff on probation. She was advised that the company wanted to assist her in addressing the perceived performance and behavioral issues that had been highlighted in her 2005 review. To that end, she was asked to develop, by January 20, 2006, an action plan to address the issues that had been outlined in her review. Plaintiff stated that she understood what was expected of her and that a week's time was sufficient for her to prepare the plan. She was advised that, if she refused to develop a plan, developed a plan but did not follow it, or was insubordinate, she would be terminated from her management position.

Plaintiff did not prepare an action plan by January 20. Instead, on January 24, 2006, Troccia wrote to Plaintiff to memorialize the January 13 meeting and provide her with additional time - to January 25 - to prepare her action plan. Troccia reiterated that her job was in jeopardy unless she immediately improved. In response, Plaintiff sent Bill Farley an e-mail that was intended to be her action plan. Among her action items was:

> I want to have a meeting with a manager, which I choose not to name, who remains cool, calm, and collective (*sic*), no matter who is looking for a witch hunt, intimidating, humiliating, degrading, lying, and button pushing. I am sure I could learn a great deal.

6

Troccia consulted with Employee Relations regarding Plaintiff's response. In turn, Delaware & Hudson asked John Leis, a newly-appointed yard manager,[7] to review Plaintiff's situation. Leis met with Plaintiff on March 30, 2006. He reviewed with Plaintiff the performance and behavior issues that had been highlighted in her 2005 review and that had been the subject of Plaintiff's meeting with Troccia and Buchanan in January. He also attempted to explain the action plan procedure to help Plaintiff develop a plan so that she could achieve her performance goals. Plaintiff reported to Leis that Troccia was harassing her by treating her unfairly and constantly yelling at her. As a result of his meeting with Plaintiff, Leis questioned whether Plaintiff should continue working in a management position and opined that she posed a liability to the company. Based on Leis's report of his March 30 meeting with Plaintiff, Delaware & Hudson took Plaintiff out of service (i.e., suspended her).

On April 1, 2006, John Bairaktaris, Defendant's Service Area Manager, ordered that the Human Resource Department perform an investigation into Plaintiff's allegations. Bairaktaris also wrote that the details regarding Plaintiff's performance and behavior issues caused him concern in light of the "safety sensitive role" she occupied and that such details would "have to be developed." On April 3, Defendant's Human Resource Department began an investigation into Plaintiff's allegations and the surrounding circumstances. Terri Revell, one of Defendant's Employee Relations Advisors, gathered facts and information relative to Plaintiff's allegations and reported her findings to her

---

[7] Leis was promoted to the yard manager position on January 1, 2006 and began his supervisory duties in February 2006. In the yard manager position in Binghamton, Leis was responsible for overseeing all of the TYCs, including Plaintiff, and reported directly to Troccia. Before January 1, 2006, Leis had not worked with or had prior contact with either Plaintiff or the other TYCs in Binghamton.

superiors. Plaintiff contends, however, that this was not a complete investigation because Revell could not recall whether she had done anything "to either assist, investigate, or review Mr. Troccia's behaviors to Ms. Gioia" despite that one of Gioia's co-worker had also complained about the way Troccia regularly yelled at Plaintiff.[8] Revell Dep., pp. 40-41.

Defendant's management and Human Resources Department reviewed the information that Revell gathered and determined that Plaintiff's ongoing performance issues and inappropriate and insubordinate behavior warranted termination. In support of the decision, Bairaktaris wrote:

> Examination of the numerous documents and e-mails on record show that local Management has been working with [Plaintiff] to improve her behavior and performance over a long period of time.
>
> There (*sic*) record contains literally countless e-mails from Ms. Gioia deflecting responsibility for either work performance or behavioral issues over the course of the last few years at least. Apart from Ms. Gioia's "Partial Achieves" PMP rating for 2005, she has received "Partial Achieves" ratings at least 2 other times including 2002. . . .
>
> There is a history here of numerous attempts by her Managers to help Ms. Gioia, however, the record shows that coaching attempts have no effect on her behavior. Ms. Gioia's unwillingness to adjust her [] (unacceptable) behavior cannot be reconciled with the responsibilities of a front line manager nor an employee of CPR in any capacity. . . .

Thus, Bairaktaris determined that Plaintiff's employment would be terminated. The termination decision was approved by Brock Winter, Defendant's Vice President of Operations, and by Cathryn Frankenberg, Defendant's Assistant Vice President of Labor Relations & Human Resources. By letter dated May 2, 2006, Troccia advised Plaintiff that her employment was terminated effective immediately. Plaintiff was 55 years old at the

---

[8]The co-worker, Ken Fletcher, reported in April, 2006 that Troccia regularly yelled at Plaintiff and a male co-employee. There is no dispute that Revell spoke to Fletcher as part of her investigation.

time.

Plaintiff asserts that after she was terminated, she was replaced by several male employees who were in their 30's.  Defendant contends that Plaintiff was not replaced but rather that Delaware & Hudson went through a restructuring related to the TYC position and that the responsibilities of the position changed. Thus, Defendant contends, Plaintiff's responsibilities were divided between several individuals who were already working for Delaware & Hudson.  Defendant admits that these individuals were in their 30s.  After Plaintiff's termination, her request to be reinstated as a union employee (*i.e.* a non-management position) was denied. Although Plaintiff is able to provide the names of three male employees who left their management positions and were allowed to return to union positions, she provides no basis upon which to conclude that these individuals were similarly situated to her.

### III.   DISCUSSION

#### a.   Age Discrimination Claims

Plaintiff contends that her termination was motivated, at least in part, by impermissible considerations of her age.  Disparate treatment age discrimination claims under the ADEA are analyzed under the three-part shifting burden test established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000).  Under the McDonnell Douglas test, a plaintiff must first establish a *prima facie* case of age discrimination surrounding the adverse employment action in issue. If the plaintiff meets this minimal burden, see McPherson v. New York City Dep't of Educ., 457 F.3d 211, 215 (2d Cir. 2006)(the burden of establishing a *prima facie*

9

case of employment discrimination is minimal), the employer must then articulate a legitimate non-discriminatory reasons for the challenged employment action. If the employer does so, the plaintiff may present evidence from which a finder of fact could conclude "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination," or that illegal discrimination was the true motivation behind the adverse employment action in issue. McDonnell Douglas, 411 U.S. at 802-04. The burden to persuade the trier of fact "that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252 (1981).

"A *prima facie* case of age discrimination requires that plaintiff[] demonstrate membership in a protected class, qualification for [her] position, an adverse employment action, and circumstances that support an inference of age discrimination. . . ." Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 238 - 241 (2d Cir. 2007). As evidence of age discrimination, Plaintiff points out that she was 55 years old when she was terminated, that she held the TYC position for several years before receiving unsatisfactory reviews from Troccia, that Troccia stated during her 2003 PMP that "maybe [she] was just too old to change," and that, after her discharge, she was replaced by employees who were in their 30's. This is sufficient on this motion to establish a *prima facie* case of employment discrimination.

In response, Defendant asserts that Plaintiff was discharged for the legitimate, non-discriminatory reason that she failed to properly perform the functions of her position, was regularly insubordinate to her supervisor, was unable to get along with co-workers, and failed to remedy the problems despite repeated attempts by Defendant to assist her.

10

This is sufficient to shift the burden back to Plaintiff to establish that considerations of Plaintiff's age was a motivation for her discharge. See Meiri v. Dacon, 759 F .2d 989, 997 (2d Cir. 1985)(a "profound inability to get along with [ ] co-workers . . . represents a legitimate, nondiscriminatory reason for an employment decision" ); Lee v. Healthfirst, Inc., 2007 WL 634445,at *24 (S.D.N.Y. March 1, 2007)("Plaintiff's insubordination and failure to fulfill her job responsibilities as a sales representative are legitimate justifications for the withholding of her bonus and her discharge."); Chapkines v. New York Univ., 2005 WL 167603, at *8 (S.D.N.Y. Jan. 25, 2005) ("An employer may permissibly terminate an employee based on [the employee's] inappropriate comments, perceived insubordination or disruptive behavior in the workplace."); Wilcox v. Runyon, 1995 WL 468270, at *4 (E.D.N.Y. July 31, 1995) ("An inability to get along with co-workers is a legitimate, non-discriminatory reason for terminating or disciplining an employee."); Edwards v. Interboro Inst., 840 F. Supp. 222, 230 (E.D.N.Y. 1994) ("[B]latant employee insubordination is a legitimate reason for terminating employment.").

While the trier of fact can consider the evidence underlying the *prima facie* case in making the ultimate determination, the evidence underlying the *prima facie* case in this action is insufficient to support Plaintiff's ultimate burden of establishing that her termination occurred because of her age. Troccia's statement about Plaintiff's age was made almost three years before her discharge, and the statement is ambiguous at best. Moreover, the record is full of interactions between Plaintiff and Troccia in the time period between the 2003 statement and her discharge, yet there is a lack any additional reference to Plaintiff's age or any basis from which a fact finder could reasonably conclude that considerations of Plaintiff's age played a role in the employer's decision to discharge

her.  "[T]he more remote and oblique the [allegedly discriminatory] remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115 (2d Cir. 2007); see Maqsood v. Bell Security, Inc., 249 Fed. Appx. 229, 230, 2007 WL2886735, at *1 (2d Cir. Sept. 28, 2007)("Here, certain comments were allegedly made by Bell Security's employees approximately two years before Maqsood's termination, and were thus 'remote' from any adverse employment action.  Moreover, such comments were isolated, ambiguous, and insufficient to support a finding of discrimination based on national origin or religion.").

Further, the fact that the statement was made by Troccia, the individual who promoted Plaintiff when she was already in the protected age classification, weakens the inference that can be drawn from the statement. See Matthews v. Huntington, 499 F. Supp.2d 258, 267-68 (E.D.N.Y. 2007) (inference of discrimination is weakened by the fact that plaintiff was well within the protected class when hired); Ghent v. Moore, 519 F. Supp.2d 328, 338 (W.D.N.Y. 2007) (finding that "it is difficult to impute [] an invidious motivation that would be inconsistent with the decision to hire."). Thus, the 2003 statement, in itself, provides insufficient evidence from which a reasonable finder of fact could conclude that age played a part in the employer's termination decision.

Similarly, the mere fact that Plaintiff was 55 years old  when discharged and that individuals outside the protected classification were put into Plaintiff's position afterward does not establish that age discrimination occurred.  "The replacement of an older worker with a younger worker or workers does not itself prove unlawful discrimination," and these facts alone are insufficient to withstand summary judgment. Fagan v. NY State Elec. &

Gas Corp., 186 F.3d 127, 134 (2d Cir. 1999)(citing Hollander v. American Cyanamid Co., 172 F.3d 192, 199 n. 3, 204 (2d Cir.1999) (affirming grant of summary judgment for defendant although plaintiff had established dispute of fact as to whether he had been replaced by younger workers)); see Peres v. Oceanside Union Free School Dist., 2008 WL 305342, *12 (E.D.N.Y. Jan 31, 2008)("The lone fact that the AP Coordinator position went to Ms. Nappi, a thirty-eight year old, is insufficient to defeat summary judgment.").

Even viewing these facts together - Plaintiff's age at the time of termination, the 2003 statement, and the replacement by younger workers - there still is insufficient evidence from which a reasonable fact finder could conclude that considerations of Plaintiff's age motivated the termination decision. See Dawson v. Bumble & Bumble, 398 F.3d 211, 224-25 (2d Cir. 2005)(an employer's intent to discriminate must be evaluated by reference to the decision-maker actually ordering the adverse employment action, not to other persons in the company). The ultimate termination decision was made by individuals other than Troccia based upon their review of Plaintiff's work record. As indicated above, the record is replete with instances from which it could reasonably be concluded that Plaintiff regularly acted in an insubordinate manner toward Troccia, and she continued the conduct even after being warned that it would lead to her termination. Assuming, *arguendo*, that Troccia created a hostile work environment for Plaintiff (discussed *infra*), Plaintiff's recourse was to use the employer's internal procedures to address the problems she had with Troccia. By repeatedly responding to Troccia in the manner that she did despite having been warned that such conduct could result in her termination, Plaintiff established what objectively appeared to be a non-discriminatory basis for her discharge. Plaintiff's contention that age played a role in this determination is

based on nothing more than mere surmise and speculation arising from a three year-old statement and the circumstances of her discharge. This surmise and speculation, without more, is insufficient to carry Plaintiff's ultimate burden on her ADEA disparate treatment claim. See Bickerstaff v. Vassar College, 196 F.3d 435, 456 (2d Cir.1999)(The Plaintiffs' "feelings and perceptions of being discriminated against are not evidence of discrimination."); McDonald v. Maimonides Med. Ctr., 2002 WL 257818, at * 6 (E.D.N.Y. Jan. 3, 2002)("McDonald's subjective feelings as to what Dunn might have been thinking cannot amount to evidence of age discrimination."); see also Bickerstaff, 196 F. 3d at 448;[9] Ford v. Consolidated Edison Co. of New York, Inc., 2006 WL 538116, at *12 (S.D.N.Y. Mar. 3, 2006) ("Although Plaintiff makes conclusory allegations of pretext, those allegations are completely undermined by the largely undisputed evidence that Plaintiff [failed to perform his job and was insubordinate]."); Mathurin v. Skrivaneck, 2003 WL 23744279, *13 (S.D.N.Y. June 10, 2003) ("regardless of whether plaintiff agrees or disagrees with defendant's assessment of her, and regardless of whether that assessment was justified, the defendant's belief in her inadequacy precludes liability. . . . .); Lee, 2007 WL 634445, at *24 ("Where an employee has been warned that her job performance is unsatisfactory and she continues the same conduct, she cannot shield herself from

---

[9] As indicated in Bickerstaff, on a motion for summary judgment the Court:

must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture. This undertaking is not one of guesswork or theorization. After all, an inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist. Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances.

Bickerstaff, 196 F.3d at 448 (internal quotation marks and citations omitted).

14

legitimate managerial prerogatives by threatening a discrimination complaint and then alleging unlawful retaliation."). Plaintiff has not presented sufficient evidence from which a reasonable juror could conclude that the employer's stated reason for her discharge was merely a pretext for age discrimination or that age played a role in the discharge determination. Accordingly, the age-based wrongful discharge claim is dismissed.

While it does not appear that Plaintiff has asserted an aged-based hostile work environment claim,[10] such a claim would nevertheless fail because Plaintiff has not presented sufficient evidence from which a reasonable fact finder could conclude that the conditions of her employment - if actionably hostile - were created because of her age. See Kassner, 496 F.3d at 241 ("A plaintiff bringing a hostile work environment claim under the ADEA must show that . . . she was subjected to the hostility because of her [age]."); see also Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007)(The *sine qua non* of a discrimination claim is that the discrimination occurred because of the protected classification invoked in the claim.). As discussed above, there is a lack of evidence from which to infer age-based animosity in Troccia's conduct following his 2003 statement. Thus, even if actionably hostile, there no basis from which a reasonable fact finder could conclude that considerations of Plaintiff's age motivated the conduct. Therefore, Defendant's motion is granted dismissing Plaintiff's ADEA claims.

**b.    Gender Claims**

Similar to the reasons discussed above with regard to the age claim, the gender-based discriminatory discharge claim must also be dismissed. Assuming that Troccia held

---

[10] Plaintiff has not addressed an age-based hostile work environment claim in her Memorandum of Law in Opposition to Defendant's motion.

15

gender-based animosity toward Plaintiff, there is insufficient evidence from which reasonable fact finder could conclude that this animosity was imputed to the employer or that the employer considered Plaintiff's gender when it determined to discharge her. As indicated above, the record contains numerous emails from Plaintiff that could objectively be construed as insubordinate communications, and there is no dispute that the conduct continued after Plaintiff was warned that her job was in jeopardy if she did not change her behavior. Although the 2003 PMP and Troccia's ensuing conduct toward Plaintiff were cloaked with comments and innuendo that invoked negative gender stereotyping, Plaintiff offers nothing beyond surmise and speculation that the employer's decision to terminate her was based upon considerations of her gender. As indicated above, the determination was made by individuals other than Troccia, and Plaintiff was discharged only after being given many chances to improve her conduct - all of which objectively appeared futile. Accordingly, the gender-based disparate treatment claim is dismissed.

The Court next turns to the gender-based hostile work environment claim. A hostile work environment is one in which "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998).

> To prevail on a hostile work environment claim, a plaintiff must show "conduct (1) that is 'objectively' severe or pervasive-that is, [conduct that] creates an environment that a reasonable person would find hostile or abusive [the 'objective' requirement], (2) that the plaintiff 'subjectively perceives' as hostile or abusive [the 'subjective' requirement], and (3) that creates such an environment because of plaintiff's sex... [the 'prohibited causal factor' requirement]." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001)(citing Gregory v. Daly, 243 F.3d 687, 691-92 (2d Cir. 2001)).

16

Byra-Grzegorczyk v. BristolMyers Squibb Co., 2008 WL 3870692, at * 9  (D. Conn. Aug. 20, 2008).

"In order to satisfy the objective component, 'the misconduct must be severe or pervasive.'" Id. (quoting Petrosino v. Bell Atl., 385 F.3d 210, 221 (2d Cir. 2004)).  In this context, the Second Circuit has instructed:

> The matter of whether the conduct alleged was so "severe or pervasive" as to create "an objectively hostile or abusive work environment," is to be decided based on the totality of the circumstances, in light of such factors as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

Patterson v. County of Oneida, 375 F.3d 206, 227 (2d Cir. 2004)(quoting Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993)).

Plaintiff contends that her treatment by Troccia was pervasive in that it continued over the last thirty-six months of her employment.  Defendant argues that the conduct, if it occurred, did not amount to an actionable hostile work environment because it was episodic and because the majority of the complained-of conduct occurred three years in advance of Plaintiff's discharge.  Accepting as true the contention that Plaintiff was regularly singled out by Troccia, yelled at, and forced to work under conditions separate from all male TYCs, a finder of fact could reasonably conclude that the environment was objectively hostile. In this regard, a reasonable trier of fact could conclude that Troccia's conduct amounted to a steady barrage of insulting, demeaning, and degrading comments and actions that were sufficiently continuous and concerted so as to be deemed pervasive and frequent. See Howley v. Town of Stratford, 217 F.3d 141, 154-56 (2d Cir. 2000)(holding that conduct "diminishing the respect accorded [plaintiff] by subordinates

17

and thereby impairing her ability to lead" can, in appropriate circumstances, contribute to a hostile work environment). Thus, Plaintiff has presented sufficient evidence to satisfy the objective element on this motion. See Terry v. Ashcroft, 336 F.3d 128, 147-50 (2d Cir. 2003).[11]

There is no dispute that Plaintiff perceived the conditions of her employment as hostile and abusive. She asserts that she was repeatedly singled out for unfair treatment, regularly yelled at, and demeaned by her supervisor, and a co-employee testified that she often cried in response to Troccia's yelling. Thus, the subjective requirement is satisfied on this motion.

The next question is whether Troccia acted toward Plaintiff in the manner that he did because of her gender. Oncale, 523 U.S. at 81 (Plaintiff must show that the working environment was not merely hostile or abusive, "but actually constituted 'discrimina[tion] ... because of ... gender.'")(alteration in original; quoting 42 U.S.C. § 2000e-2(a)(1)). "In determining whether an employee has been discriminated against 'because of *such individual's* ... sex,' the courts have consistently emphasized that the ultimate issue is the reasons for *the individual plaintiff's* treatment, not the relative treatment of different *groups* within the workplace." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001)(emphasis in

---

[11] The Second Circuit explained in Terry that

> while the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that 'while a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.' The environment need not be unendurable or intolerable. Nor must the victim's psychological well-being be damaged. In short, the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases.

336 F.3d at 148 (quoting Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000)).

18

original, quoting 42 U.S.C. § 2000e-2(a)(1)). "In other words, what matters in the end is not how the employer treated *other* employees, if any, of a different sex, but how the employer *would have* treated *the plaintiff* had she been of a different sex." Id. at 253-54 (emphasis in original). "In discrimination cases, the inquiry into whether the plaintiff's sex ... caused the conduct at issue often requires an assessment of individuals' motivations and state of mind, matters that call for a 'sparing' use of the summary judgment device because of juries' special advantages over judges in this area." Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001).

Taking the facts in the light most favorable to the Plaintiff, and drawing reasonable inferences therefrom, a reasonable fact finder could conclude that Troccia's treatment of Plaintiff was motivated by considerations of her gender. His comments toward, and work rules imposed upon, Plaintiff regarding the wiggling of her hips, the batting of her eyelashes, and the pouting of her lips could be construed by a finder of fact as evincing a negative stereotypical view of women in the workplace. Even assuming that Troccia's gender-laced comments and conduct occurred in 2003, a reasonable fact finder could conclude that his view of women was a motivation for all of his ensuing conduct toward Gioia. The fact that the conduct was not imposed upon Plaintiff's male counterparts provides a basis for a finder of fact to reasonably conclude that Troccia's conduct toward Plaintiff was motivated by considerations of Plaintiff's gender.

Finally, there exists a basis to impute Troccia's conduct to Defendant. Under Title VII, there is a presumption that an employer is vicariously liable for a hostile work environment created by a supervisor of a victimized employee. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998). There is no dispute that Troccia was Plaintiff's

19

supervisor for purposes of imputing liability to the employer. See Mack v. Otis Elevator Co., 326 F.3d 116, 126 (2d Cir. 2003).   Therefore, summary judgment on the gender-based hostile work environment is claim must be denied.  See Schiano v. Quality Payroll Sys., 445 F.3d 597, 605 (2d Cir. 2006) ("[H]ostile work environment claims present mixed question[s] of law and fact that are especially well-suited for jury determination. . . .  [T]hat the facts are undisputed does not automatically mandate summary judgment; rather, summary judgment is appropriate only where application of the law to those undisputed facts will reasonably support only one ultimate conclusion.").

### IV.   CONCLUSION

For the reasons discussed above, Defendant's motion for summary judgment is **GRANTED IN PART and DENIED IN PART**.  The motion is granted dismissing all of Plaintiff's claims *except* the claim of a gender-based hostile work environment.

**IT IS SO ORDERED**.

DATED: September 11, 2008

_____
Thomas J. McAvoy
Senior, U.S. District Judge